## HUMBLE OIL & REFINING CO. v. GOLDSMITH et al.

### No. 9572.

Court of Civil Appeals of Texas. Austin.

July 31, 1946.

Rehearing Denied Oct. 2, 1946.

Rex G. Baker and Nelson Jones, both of Houston, and Powell, Wirtz, Rauhut & Gideon and J. A. Rauhut, all of Austin, for appellant.

Pollard, Lawrence & Blackburn, of Tyler, for appellee Bobby Manziel.

T. C. Chadick. of Quitman, for C. O. Goldsmith.

Black, Graves & Stayton and John W. Stayton, all of Austin, for appellees Bobby Manziel & C. O. Goldsmith.

Grover Sellers, Atty. Gen., and James D. Smullen and Raymond A. Lynch, Asst. Attys. Gen., for appellee Railroad Commission of Texas.

McCLENDON, Chief Justice.

Rule 37 case. The appeal is from a final judgment refusing to cancel a permit

to drill a well upon a .0996 acre tract $7\frac{1}{2}$ varas wide (north-south) by 208 feet long (east-west) in the Hawkins townsite in the Hawkins field in Wood County, as an exception to Rule 37, in order to prevent confiscation of property. The suit was brought by Humble (Humble Oil & Refining Company, lessee of an adjoining tract to the south) against the Commission (Railroad Commission of Texas, its members and secretary) and Goldsmith (the permittee as owner of an oil and gas lease acquired from heirs of the Wells estate). The trial was to a jury, but at the close of plaintiff's evidence the court withdrew the case from the jury and rendered judgment for defendants. The Humble has appealed.

The controlling question the appeal presents is the propriety of withdrawing the case from the jury and rendering judgment for defendants. The tract in question lies between what was originally known as the Stewart lot to the north (a one acre tract 75.4 varas square) and a tract of like dimensions to the south known as the Sullivan lot. Each of these three tracts was a part of the N. E. $\frac{1}{4}$ of the Brewer survey, which was acquired in 1863 by R. P. McCorkle, who died in 1873 or 1874, after having conveyed the Sullivan and some other tracts to its east and west but none to its north. In April 1880, B. A. Wells (a brother of Mrs. McCorkle) as administrator of the McCorkle estate, for the recited consideration of $25 cash, conveyed the Stewart lot to T. B. Stewart, the field notes reading:

"Beginning $7\frac{1}{2}$ varas North of the N. W. of a one acre lot deeded to M. F. Sullivan a stake

"Thence North 9 deg E at $75\frac{4}{20}$ varas a stake for corner

"Thence E at $75\frac{4}{20}$ varas a stake for corner

"Thence South at $75\frac{4}{20}$ varas a stake for corner

"Thence W $75\frac{4}{20}$, the place of beginning containing one acre."

This tract passed by mesne conveyances to Caffey who executed a quitclaim deed to the Wells heirs in 1941, after the Hawkins oil field was discovered; the recited consideration being $10 cash. The Humble's contention is that the fee to the .0996 a. strip passed to Stewart under the above conveyance, subject to a public or private passage, road or alleyway easement; that the Wells title rests exclusively upon the Caffey quitclaim deed, thus constituting the strip a voluntary segregation from the Stewart tract, which already had one producing well. Consequently there was no basis for a well on the .0996 a. strip. The allegations of the Humble petition in this regard read: "Said $7$-$\frac{1}{2}$ varas strip between the tier of lots conveyed by McCorkle and the tier of lots later conveyed by Wells, and particularly that portion of it along the south side of the Stewart lot and north of the Sullivan lot, was and·is a passageway, road or alley, left, intended and impliedly dedicated by Wells for such purpose, suitable only for such purpose, and expressly designated by Wells as an alley in one or more of said (subsequent) conveyances, and was accepted and used by the public generally and the adjacent lot owners for such purpose. By virtue thereof the deed from Wells to Stewart operated to convey to Stewart the fee title in and to that portion of the $7$-$\frac{1}{2}$-varas strip adjoining the Stewart 1-acre lot and by mesne conveyances to A. B. Caffey, present owner of the Stewart lot."

Appellees contend, on the other hand, that there was no evidence of any dedication of a public or private easement over the strip prior to the above deed to Stewart; that that deed did not expressly or by implication create such easement; and that the fee to the strip did not pass out of the McCorkle estate by virtue of the Stewart deed or otherwise.

R. P. McCorkle died December 20, 1873, or 1874. His wife died the following May. The Wood County records were destroyed by fire in 1878, and there was no record of any proceeding in connection with the McCorkle estate, or of any conveyances by McCorkle. In 1881 B. A. Wells acquired the interests of some and later of all of the McCorkle heirs in what remained of the Brewer survey. February 21, 1888, B.A. Wells conveyed to Mrs. M. M. Giles a one acre tract described as: "Bounded on the East by the Hawkins and Big Sandy Road, and on the South by a 18 ft. alley and on

the West by one acre lot of aforesaid survey * * *."

On February 28, 1888, P. M. and M. A. Morris conveyed to J. A. Brown a one acre lot described as: "Bounded on East by Mrs. M. M. Giles one acre lot and on the South by 18 ft. alley & on the West by Thomas Stewart one acre lot * * *."

The following portion of a plat compiled by Humble engineers shows the segregated tracts situated in the S.W. corner of the N.E. ¼ of the Brewer survey in 1880 with the above Stewart, Brown and Giles lots and the Wells to Yates tract added:

The Sullivan, Allen and Crow lots faced on a street to the south, the Crow residence having both a south and west front.

The only plat of the original Hawkins townsite shown of record is one filed in 1909. Its northern extremity is the S. line of N. E. ¼ of the Brewer Survey. What is designated as the Winnsboro and Belzora Road in the above plat is an extension north of Beaulah Street in the original Hawkins townsite, and the Hawkins and Big Sandy road in the above plat was an extension north of Pine Street in the Hawkins townsite. These two roads were

HAWKINS        TOWNSITE

well recognized before 1880. The tier of lots immediately adjoining the townsite, which had been conveyed by McCorkle, appear later in abstracts of title as covered by the Brown addition. There was no recorded plat of this addition. Immediately north of the Brown addition, and including the original Stewart, Brown, and Giles one acre lots, was the Reece addition, a plat of which was recorded in 1912. The Reece addition shows a 20-foot alley to the south. There is no fact or circumstance in the record which would indicate when the Brown and Reece additions were laid out further than the necessary inference that they post-dated the conveyances of the Stewart, Brown and Giles lots, the last in 1888. We do not regard these additions as throwing any light upon the instant controversy.

The record does not show any assertion of ownership or payment of taxes by B. A. Wells or his heirs as to the strip south of the above Stewart, Brown and Giles one acre lots subsequently to the conveyance to Stewart in 1880. The above, we think, is all the record evidence bearing upon the issue of whether there was a dedication of a public or private passageway over the strip in question prior to or at the time of the Wells-Stewart deed in 1880, other than what, if any, inferences may be drawn from recitals in subsequent deeds noted below.

Two witnesses, Mrs. Zella Glaze and A. C. Wells, testified on behalf of Humble, in support of its claim that the fee to the strip in question passed to Stewart by the 1880 deed. Mrs. Glaze, born in 1866, was the daughter of "Jim" Sullivan, a merchant in Hawkins, who built a residence on the "Sullivan Place" one acre lot. He died in 1874. Mrs. Glaze first moved to Hawkins in 1873 or 1874, and lived with her family on the "Sullivan Place" lot from that time until 1880 or 1881, when she and her mother and sisters moved to Mineola. Her testimony covers the period of her residence in Hawkins. She was never there after moving to Mineola, until about 4 or 5 years before the trial (February 1946). A. C. Wells, born in 1867, was a son of B. A. Wells. He first moved to Hawkins in 1880 or 1883, and lived with his father's family in the "Old Wells Home," which

was on the Hawkins and Big Sandy Road about ¾ mile N. E. of the "John Crow Place." There was some confusion in his testimony as to the exact year he moved to Hawkins (whether 1880 or 1883), but we attach little importance to the exact year. The testimony of both of these witnesses shows that the area immediately north of the Sullivan-Allen-Crow tier of lots was unfenced woodland during the period testified to; that the school (which each attended) and the two roads were located as shown on the above plat; that school children belonging to the Wells and other families, as well as others, used the area just north of the Sullivan-Allen-Crow lots as a short cut passage in traveling between the two roads. Mrs. Glaze described the situation thus: " * * * there was a lane back there that was traveled quite a bit, and school children, you know, we used to meet the Giles children—we cut across our patch and met them on the corner there, and then this alley or whatever you want to call it back behind there north of our place. * * * The alley did (run north of their place), yes. It run on up to the other road.

"Q. In other words, this alley ran between the road on the west side of your mother's house going up to the school and the road on the east side of the Crow place that went on out to the Wells home. A. Yes."

A. C. Wells' testimony was to the effect that you could go either way to the school, either in front of or behind the Crow and Sullivan places.

When the Sullivans moved to Mineola the Sullivan place was sold to Mrs. Giles. A deed in 1904 from the latter to J. A. Giles described the property as having been bought by John Sullivan from R. B. McCorkle, and by Mrs. Giles from Mrs. John Sullivan in 1882, and as bounded "on the North by lots sold by B. A. Wells to Tom Stewart and others and on the West by the Winnsboro and Belzora Public Road and on the South by the town of Hawkins."

We do not regard the testimony of Mrs. Glaze or A. C. Wells as sufficient to establish an easement over the McCorkle lands, prior to the Stewart deed in 1880.

See Worthington v. Wade, 82 Tex. 26, 17 S.W. 520.

The rule contended for by Humble, and which we think is determinative of the instant controversy, is thus expressed in Cantley v. Gulf Production Co., 135 Tex. 339, 143 S.W.2d 912, 915 (Associate Justice Sharp writing): "It is well known that separate ownership of long narrow strips of land, distinct from the land adjoining on each side, is a fruitful source of litigation and dispute. To avoid this source of contention, it is presumed that a grantor has no intention of reserving a fee in a narrow strip of land adjoining the land conveyed when it ceases to be of use to him, unless such fee is clearly reserved. The reason for the rule is obvious. Where it appears that a grantor has conveyed all land owned by him adjoining a narrow strip of land that has ceased to be of any benefit or importance to him, the presumption is that the grantor intended to include such strip in such conveyance; unless it clearly appears in the deed, by plain and specific language, that the grantor intended to reserve the strip. See Cox v. Campbell, Tex. Sup., 143 S.W.2d 361; Rio Bravo Oil Co. v. Weed, 121 Tex. 427, 50 S.W.2d 1080, 85 A.L.R. 391; Texas Bitulithic Co. v. Warwick, Tex.Com.App., 293 S.W. 160. For an annotation of the decisions bearing on this question, see also 123 A.L.R. 543, 47 A.L.R. 1277, and 2 A.L.R. 7."

The facts in that case were not on all fours with those here; but the above statement of the rule there applied does, we think, clearly fit and control the case at bar. We have here sales by McCorkle of a tier of one acre lots abutting and fronting on the townsite of Hawkins. These lots were evidently intended and were improved as urban residence property. They fronted south on a public street in the town of Hawkins and extended from a road on the west to a road on the east. This was the situation when in 1880 Wells, as administrator of McCorkle, conveyed to Stewart the one acre lot north and to the rear of the Sullivan lot, leaving a space of only 7½ varas (approximately 20 feet) between the two lots. The record affords no reasonable hypothesis upon which to base the intention of the grantor in leaving this narrow strip between the two lots, than that it was intended for passageway purposes only. It was not wide enough to serve any other useful purpose to the grantor. It was not even wide enough for ordinary street purposes, but only for use as an alleyway. The subsequent acts and conduct of Wells and his heirs corroborate the view that the strip was left for passageway purposes only. In 1888 Wells, the then owner of the unsold balance of the McCorkle holdings in the Brewer survey, conveyed the Giles one acre lot expressly calling for an alley as its south boundary, and referring to a "one acre lot" as its west boundary. There was no deed shown conveying this latter lot out of Wells or the McCorkle estate, but there must have been such conveyance antedating the deed to Mrs. Giles, as this reference clearly indicates. Just one month after the Mrs. Giles deed the deed from the Morrises to Brown conveyed this inside lot, referring to the Stewart and Giles lots as its western and eastern boundaries and an alley as its south boundary. When the subdivision was at some later date platted, it showed this strip and the eastward extension of it as a 20-foot alley. The conveyance in 1904 of the Sullivan lot gave as its northern boundary the lots sold by Wells to Stewart and others. These facts, coupled with the non-assertion of ownership by the Wellses for over sixty years, evidence an unbroken recognition in the community, for over half a century, participated in by the Wellses, of an alleyway covering the strip in question and its extension east to the Hawkins and Big Sandy Road.

Appellees' contention that there was no evidence of a presumptive dedication and consequent passage of fee title to the strip is predicated upon the propositions: 1) that the situation must be viewed as of the date of the Wells-Stewart conveyance; 2) that subsequent conveyances and conduct by Wells cannot be considered as evidence of his prior intention in 1880; 3) that leaving the strip, with the fee title reserved in himself, was perfectly consistent with an intention to reserve a passageway for school children, including his own. It is of course true that the situation must be viewed as of the

date of the Stewart deed. It is also true that at that date there had been no dedication of the strip to passageway uses. Consequently, the case as concerns this strip does not fall within the precise holding of those where the property actually borders on an existing street or alley although no mention of that fact is made in the conveyance. The reasoning, however, which would presume the dedication of an alleyway and consequent conveyance of the fee, is just as cogent in the instant case as in those cases. Why would one in 1880 leave a 20-foot strip adjoining an acre town lot—a strip of only $\frac{1}{10}$ acre and of only nominal value based upon the sales price of the lot, and of no practical value to the grantor after the conveyance, except for alleyway purposes, the only conceivable use to which it could reasonably be devoted. Concede that the grantor may have wished the strip to be used as a passageway for school children, including his own, such use was in no way inconsistent with a dedication for alleyway uses. The grantor had other property to the east which when sold off in one acre lots would be served by an extension of such alleyway.

Conceding that the situation must be viewed as of the date of the Stewart deed, it does not fellow that subsequent events have no evidentiary bearing upon the prior intention of the grantor; especially is that true when such subsequent events are corroborative of and consistent only with ascribing to the grantor the only reasonable intention which the grant, read as a whole and in the light of then surrounding circumstances, will import. Only the discovery of oil served as an incentive to exhume the lifeless corpse of an asserted reserved fee title to this narrow strip buried for over sixty years from the now asserting owners, their predecessors in title and the world at large.

We have not thought it necessary to analyze the cases cited by appellees in support of their contention in this regard. Factually, they are, we think, clearly distinguishable from the case at bar.

Appellees plead as res judicata a judgment rendered in 1942, in a suit in trespass to try title brought by the Wells heirs against Humble and others, including one Smith, the owner of the fee to the Sullivan lot, to recover the strip in question. The Humble and Smith disclaimed any interest in the property sued for. Exceptions to this pleading were overruled and this ruling is assigned as error by the Humble. The point is not briefed by appellees. The ruling is immaterial in our above view of the controlling issue in the case. We might add, however, that we regard the plea of res judicata as without merit in the instant suit. There is no theory upon which Humble or Smith might assert any title in the strip, which was the only issue in the trespass to try title suit that concerned the Humble or Smith. There was no adversary suit as between the plaintiffs in that suit and the owners of the fee to the Stewart lot, since those owners had previously conveyed all their title in the strip to those plaintiffs.

The above conclusion renders unimportant the ruling of the trial court excluding certain portions of the testimony of A. C. Wells given in the hearing of the application for the permit before the Commission.

The trial court's judgment is reversed; the permit in issue is cancelled; and the cause remanded to the trial court with instructions to grant to appellant appropriate ancillary relief.

Reversed; permit cancelled; and cause remanded with instructions.

BLAIR, Justice (dissenting).

The sole question on this appeal is the proper construction of the deed of 1880 from Wells to Stewart, which describes the land conveyed as follows:

"Beginning 7-½ varas North of the N. W. of a one acre lot deeded to M. F. Sullivan a stake

"Thence North 9 deg E at 75½⁄20 varas a stake for corner

"Thence E at 75½⁄20 varas a stake for corner

"Thence South at 75½⁄20 varas a stake for corner

"Thence W 75½⁄20, the place of beginning containing one acre."

This plain and specific language clearly shows the intention of the grantor to convey by the deed only a one-acre tract of land

75.4 varas square, lying 7.5 varas north of the Sullivan lot. The majority, however, construe the deed as also conveying the fee to Stewart to the strip of land 7.5 varas wide by 75.4 varas long, lying immediately south of the one acre tract described in the deed, or as conveying an additional 1/10-acre tract. In so construing the deed the majority opinion seeks to apply 1) the rule of presumption against the reservation of a small, narrow, or useless strip of land from the conveyance of a larger adjoining tract; and 2) the rule of presumption that the conveyance of a tract of land bounded by or with reference to an alley, street or other public way, the fee thereto being owned by grantor, carries the fee to grantee to half or all of the alley, street or other public way, as the case may be. It is my view that the deed cannot be so construed under the facts stated in the majority opinion, and that the majority opinion extends the foregoing rules of construction of a deed far beyond any case cited or adjudicated, and far beyond the field in which such rules were intended to or have been heretofore applied by the courts.

The case of Cantley v. Gulf Production Co., 135 Tex. 339, 143 S.W.2d 912, 915, is cited and quoted from by the majority as supporting their application to the instant case of the rule of presumption against the reservation of a small, narrow, or useless strip of land from the conveyance of a larger adjoining tract. The majority concede, however, that the facts of the Cantley case are not on all fours with the facts of the instant case. It is my view that the facts of the instant case entirely distinguish it from the Cantley case.

The rule stated in the Cantley case is that "where it appears that a grantor has conveyed all land owned by him adjoining a narrow strip of land that had ceased to be of any benefit or importance to him, the presumption is that the grantor intended to include such strip in such conveyance; unless it clearly appears in the deed, by plain and specific language, that the grantor intended to reserve the strip." With this rule there is no disagreement. It is a salutary one. The rule, however, has no application to the instant case for two reasons:

In the first place "it clearly appears in the deed, by plain and specific language, that the grantor intended to reserve the strip" 7½ varas wide from the conveyance. This intention of the grantor is made clear and conclusive by the plain and unambiguous language of the deed describing the beginning point of the land conveyed at "7½ varas north of the N. W." corner of the subdivision lot. The deed then describes the land intended to be conveyed by course and distance calls which operate with mathematical certainty to convey only a one-acre tract about 75.4 varas square. The deed merely calls for and conveys a tract of land lying 7.5 varas north of the Sullivan lot. The majority give the deed the same effect as if its description called for a beginning point at the northwest corner of the Sullivan lot.

It seems to me that the effect of the majority opinion is to rewrite, sixty-six years after the fact, the deed from Wells to Stewart. If Wells did not desire to convey the fee of the strip to Stewart, how could he have better effected such intent other than by failing to include the strip in the land described in the conveyance? When Wells executed the deed in question he chose to describe the land conveyed by course and distance, calls that operate with mathematical certainty. He described the west line as beginning at a point that can be determined with absolute accuracy, a point "7½ varas North of the N. W. of a one acre lot deeded to M. F. Sullivan." He then described the west line as a line running north 9° east for a distance of 75 45/100 varas. The length of this line can be determined with absolute accuracy. Yet the majority's construction of the deed adds 7.5 varas to the length of the west line, makes the same addition to the length of the east line, and moves the south line 7.5 varas south of where it is called for in Wells' conveyance. What is there in the field notes used by Wells that permits any such revisions of the calls for distance? Manifestly, a call for a point 7.5 varas north of the northwest corner of the Sullivan tract is not a call for the northwest corner of the Sullivan tract; and a call for a west line 75 45/100 varas long

is not a call for a west line 82¼⁄₂₀ varas long.

In the second place the rule against the reservation of a small, narrow, or useless strip of land from the conveyance of the larger adjoining tract has no application here, because Wells knew that he had reserved the strip from the conveyance, and the very evidence relied upon by the majority proves, if it proves anything, why Wells did not convey the strip to Stewart. That is, the majority emphasize the fact that Wells, administrator, failed to include the 7½-vara strip in the land described in the deed to Stewart, because he, Wells, wanted the strip used as a passage-way by children going to school, and the further fact that this was the only use to which the strip was adapted. Thus it is shown that Wells did have a use for the strip of land. One of the necessary elements of the rule of presumption against the reservation of a small or narrow strip from the conveyance of the larger adjoining tract is that the small or narrow strip has "ceased to be of any benefit or importance" to grantor. Cantley case, supra. So the very evidence relied upon by the majority shows, if it shows anything, that Wells had a reason, and a very good reason, for not conveying the strip of land 7.5 varas wide to Stewart; that it was not Wells' intention to convey the strip to Stewart. He did not convey it to Stewart because he, Wells, wanted the Wells, the McCorkle, and other children to use the strip as a short cut to school. I see no basis whatever for the holding of the majority that grantor intended by the deed to convey the fee to the 7.5-vara strip to Stewart. Wells left the fee to the strip in the McCorkle estate by not including or conveying it to Stewart, which he had the right to do. These facts clearly distinguish the instant case from the Cantley case, first, because the deed clearly shows that wells knew of the 7.5-vara strip of land and intended to reserve it from the conveyance of the tract described in the deed; and, second, because the strip reserved from the conveyance was of benefit to the Wells, the McCorkle, and other children as a nearer way to school.

An owner of land certainly has the right to convey all of it or any part of it, however small or useless the reserved strip may be to him. If his deed shows that he did not convey a strip of land, it should be interpreted in accordance with its terms and its field note calls. In the instant case grantor specifically called for the beginning point of the land conveyed at 7½ varas north of the Sullivan lot, thus showing that grantor did not intend by the deed to convey the 7½-vara strip to Stewart. No language of the deed refers to any use whatever to be made of this 7½-vara strip, either public or private. Since the language of the deed clearly does not convey the strip, the question of whether it is of any value to grantor is wholly immaterial. His contract is to be measured by its own provisions where plain and not by assumed presumptions, unless there existed at the time other facts bringing it within the rules of such presumptions. The rule most nearly applicable to the deed in question is that the mere delineation of lines which show an open space not specifically designated for private use, does not, without more, disclose a presumed intention to convey, or an intention to dedicate such space to public use. Weidemeyer v. Reitch, 49 Tex.Civ. App. 166, 108 S.W. 167, writ refused; Ladies' Benevolent Society v. Magnolia Cemetery Co., Tex.Com.App., 288 S.W. 812.

For the foregoing reasons, it seems plain to me that the deed to Stewart did not convey to him the strip of land 7.5 varas wide lying between his tract and the Sullivan tract, irrespective of whether or not Wells intended to dedicate, or at some time did dedicate, the strip to use as a passageway. If Wells had any such intention and if he did dedicate the strip, he did so by dedicating land belonging to the McCorkle estate and not to Stewart,—land he had failed to convey to Stewart.

The majority also seek to apply another rule of presumption and to give the deed in question a twofold effect, that of dedicating the 7½-vara strip as an alley or other public way, and that of conveying the fee to the strip of land not conveyed by the deed to Stewart. I cannot agree with this construction placed upon the deed. I cannot agree with the majority holding that the conveyance of the one-acre tract to Stewart dedicated the strip as a passage-

way. But before expressing my views about this, I must register my disagreement with my colleagues' action in determining the issue of dedication upon the basis of happenings that occurred long after execution of the Stewart deed. I do not believe that such matters should be considered as evidence of what Wells intended when he executed that deed.

If the deed had the twofold effect given it by my colleagues, that of dedicating the strip as a passageway and that of conveying the fee of the strip to Stewart, any facts and circumstances giving it such effect must be facts and circumstances existing when the deed was executed by Wells. Whatever Stewart obtained under the conveyance was obtained at the moment it was executed. If he got title to the fee of the trip, he got it at that moment. The conveyance must be construed in the light of, and only in the light of, facts then existing.

I cannot follow the majority in giving weight to matters happening long after execution of the deed to Stewart. How can the effect of that deed be enlarged or restricted by the fact that in 1912, thirty-two years after the conveyance to Stewart, some one unknown filed a plat of the Reece addititon which showed an alley south of the Stewart lot? Of what possible significance is the fact that in 1888, eight years after the conveyance to Stewart, Wells conveyed a one-acre tract east of the Stewart tract and described the tract conveyed as being bounded on the south by an alley? These facts may tend to show what Wells intended at the times involved, but they throw no light upon the effect of the conveyance from Wells to Stewart in 1880. The effect of that conveyance, as of every conveyance, must be determined by its language, considered, under certain circumstances, in connection with the surrounding facts, facts existing at the time of its execution.

The majority concede that the 7½-vara strip had not been dedicated to public use when the deed was executed. They also concede "that the situation must be viewed as of the date of the Stewart deed," but after announcing this rule they proceed to do violence to it by viewing the situation in the light of what happened throughout the period of sixty-six years following the date of the execution of the deed. To assert that a transaction must be viewed as of the date it happened and to then assert that something occurring thirty-two years later may be looked to in determining the effect of the transaction is to lay down principles which, to my mind, contradict each other.

Coming now to the question of dedication, it is clear to me that the record contains no evidence that would sustain a finding that Wells dedicated the strip to use as a passageway when he conveyed the one-acre tract to Stewart. There is certainly nothing in the conveyance itself to evidence a dedication; the deed does not refer to the strip or to a passageway of any kind. The only evidence that might be pertinent, other than the deed itself, is the testimony of A. C. Wells and of Mrs. Glaze that children (approximate number not shown) sometimes used the strip as a short cut when going to school (the extent of the use and its duration in time not shown). This evidence will not, to my mind, sustain a finding that in 1880 Wells intended to dedicate the strip to use as a passageway, because there is no evidence whatsoever to indicate that the use was not permissive. The land in question was open country and it has long since been settled in this State that proof that individuals have used land of another as a passageway in going from one place to another proves no dedication by the owner unless it is shown that the owner knew of the use and unless it is further shown that such use was not permissive. As stated in Worthington v. Wade, 82 Tex. 26, 17 S.W. 520, 521: " * * * The only evidence of dedication was the fact that it was for a long period of time in continued use by the public as a near way of reaching the county road, which ran west of the Roberts survey, in the direction of Greenville. No act of any owner was proved which tended to show an intention to dedicate it to the use of the public. In this state, the mere acquiescence of the owner of uninclosed land in the use by the public of a road over it is not sufficient evidence of a dedication. Ramthun v. Halfman, 58 Tex. 551. See, also, Gilder v. City

of Brenham, 67 Tex. 345, 3 S.W. Rep. 309. We therefore conclude that the road was not public, and that the owner had the right to construct a fence across it."

To the same effect as the foregoing case are De George v. Goosby, 33 Tex.Civ.App. 187, 76 S.W. 66, writ refused; International & G. N. R. Co. v. Cuneo, 47 Tex.Civ. App. 622, 108 S.W. 714, writ refused; and Ramthun v. Halfman, 58 Tex. 551.

To my mind the foregoing facts are not necessarily controlling because the question involved here is not whether Wells wanted the strip used as a passageway and consequently dedicated it to such use, but whether the fee of the strip passed to Stewart. Admitting, arguendo, that Wells had the desire attributed to him by the majority, it seems plain to me that he effected his desire by failing to convey the strip. He did not convey it to Stewart because he, Wells, wanted the McCorkle estate to keep it so children going to school could use it. The very evidence relied upon by the majority proves, if it proves anything, why Wells did not convey the strip to Stewart. Yet the majority use this evidence in support of a holding that Stewart acquired the title to the strip.

If in 1880 Wells desired that the strip be left as a passageway for school children, he could have proceeded in either of two ways. He could have described the tract conveyed to Stewart as an acre bounded by an alley or other passageway, in which event Stewart, although acquiring the fee of the passageway, would have been compelled to respect the way, because he would have been estopped to deny the existence of the way. De George v. Goosby, 33 Tex. Civ.App. 187, 76 S.W. 66, writ refused; Cantley v. Gulf Production Co., 135 Tex. 339, 143 S.W.2d 912; Amerman v. Missouri, K. & T. R. Co., Tex.Civ.App., 182 S.W. 54, writ refused. Or, Wells could have done exactly what he did do: left the fee of the strip in the McCorkle estate by not conveying it to Stewart.

As I understand it, the rule that a conveyance which describes land as bounded by a highway, the fee of which is owned by the grantor, conveys the fee to half or to all of the highway springs from public policy which does not encourage the creation of narrow strips of land. But the rule itself is based upon the presumed intention of the grantor. It is presumed that he would not, if he had actually thought about the matter, have wished to retain the fee in a strip of land which would be of no benefit to him. The basis for the rule is well illustrated by Cantley v. Gulf Oil Corporation, 135 Tex. 339, 143 S.W.2d 912, where the land in question was described as " * * * beginning 30 feet W. of the N. W. cor. of Lot No. 2 * * *; thence S. 25 E. keeping 30 feet from the West line of Lot No. 2 for a road reservation 750 varas." 135 Tex. 344, 143 S.W.2d 914.

In holding that the deed conveyed the fee of the 30-foot road reservation, the court stated:

"In this instance Douglass and his children conveyed all the land they owned in this vicinity adjoining this strip of land, and surrendered possession of such land to the grantees including the strip in controversy. There is nothing in this record to show that this land was of any benefit to Douglass and his children, or that there existed any reason for reserving it at the time the conveyance was made; nor is there any language used in the deed of conveyance made by them that it was their intention to definitely reserve this strip from such conveyance.

* * * * * *

"Applying the foregoing principles announced by this Court to the facts involved here, the conclusion is inescapable, from the language used in the conveyance from Douglass and his children to the grantee, that it was the intention of the grantors to include this strip of land in such conveyance." 135 Tex. 344, 143 S.W.2d 915.

Here the very evidence relied upon by the majority of the court shows, if it shows anything, that Wells had a reason, and a very good reason, for not conveying the strip of land 7.5 varas wide to Stewart; that it was not Wells' intention to convey the strip to Stewart. These facts have already been pointed out.

Appellees have cited Cities Service Oil Co. v. Dunlap, 5 Cir., 100 F.2d 294. An opinion which, to my mind, supports their position. In that case the court was called

upon to consider the effect of an oil and gas lease executed by the heirs of J. F. Rogers. The metes and bounds description contained in the lease was copied from a partition deed under which J. F. Rogers acquired the property and this description did not include a strip of land 66 feet wide. It was the contention of the lessee, however, that this strip was included in the lease because it was adjacent to the property described in the lease and partition deed and was occupied by a public highway. Undisputed evidence showed that when J. F. Rogers and his brothers decided to partition the land in question they agreed not to partition the strip 66 feet wide, which was then being used in part as a logging road. Sometime after the partition deeds had been executed a public highway was laid out on the strip. In holding that the rule relied upon by appellant in the instant case was not applicable and that the oil and gas lease did not include the strip, Judge Sibley, speaking for the court, said: "Appellant strongly argues that although it be established that the call for the Wiley Davis corner does not belong in the deed, under settled rules of law the conveying of the land adjoining a road will carry the grantor's title to the servient fee up to the center of the road, and if the grantor has no land beyond the road the grantor's title to its further edge will pass. Such is the general rule applied both to highways and streets and alleys, non-navigable streams and railroad rights-of-way. 8 Am.Jur., Boundaries, §§ 36, 39, 22, 25; 11 C.J.S., Boundaries, § 31, 35, 45. It is based on the presumed intention of the parties that the grantor would not reserve a long, narrow strip under such way or stream for which he had no use, and partly on public policy in that such strips are likely to give rise to litigation in the distant future. But it is not unlawful to retain such a strip. If the intention to do so is clear, the contrary presumption must yield. And if the conveyance as made does not reach the highway or stream, it cannot be extended to it to avoid creating a separately owned strip. There was in 1899 no highway or street or alley covering the strip in question. A highway ran east and west through the land to be partitioned near its center. The Rogers brothers had run a sawmill on their land, and had hauled logs along the line of Davis to this highway. It was not a publicly worked way, or an established road. * * * Neither the deed nor the field notes say anything about a road. This is not a case in which a road is mentioned as a boundary, nor one in which the boundary fixed is in fact the edge of a road either public or private. The only thing that tends to make the strip in contest a road, or the equivalent of a road, is the parol evidence that the Rogers Brothers during the survey informed the surveyor, as found by the court, that 'They would leave the 66 feet out of the partition and use the same jointly, and keep it like it was; the same 66 foot tract was then being used as a logging road.' There was no covenant to dedicate the strip to the public as a road. It was subjected to no easement over the whole of it so as to convert the whole strip into a roadway. There is a plainly expressed intention not to add the strip to Lot No. 2 but to retain joint control and ownership of it. Since the deed as prepared said nothing about a road as a boundary, there was no occasion to make a reservation of the land, though to some extent on its far edge it was used for a road. The case presented is not one requiring an extension of the deed beyond its true calls. In recent years a broad public road occupying most of the strip has been laid out, but this development years after the making of the deed cannot have the effect of extending its scope. 11 C.J.S., Boundaries, § 35(4)." 100 F.2d 297, 298.

The danger which lies in the majority opinion's extension of the rule relied upon by appellant is made plain by the facts of this case. In so far as instruments of record are concerned, the fee of the strip here involved has never been conveyed to any one by the Wells heirs. Further, the strip is not referred to as an alley or other passageway in the conveyance from Wells to Stewart, which means that there was nothing of record to warn appellees that the rule relied upon by appellant might be applicable. The paper title to the Wells heirs is perfect and appellees had the right to rely upon it when they purchased their oil and gas lease.

There is the further fact that the strip in question is not a public way now; that issue has been foreclosed in appellees' favor by litigation involving, among others, appellant, the city of Hawkins, and the county of Wood. Consequently, when appellees purchased their oil and gas lease, they had no actual notice that the strip in question was or had been a public or private way. However, they have been charged with notice of, and have been deprived of their lease by reason of, the fact that some children used the strip as a short cut in going to school some sixty-six years ago. In my opinion titles should not be divested by matters of this character lying in parol.

The majority opinion emphasizes the fact that the strip was of no value to the McCorkle estate. I cannot agree with this, since the very evidence relied upon by the majority shows that it was of value to the estate as a passageway; but if the conclusion were correct, it would not in my opinion warrant the holding of the majority.

There is the further point that the record is bare of evidence that there was any acceptance by the public of Wells' offer of dedication, admitting, arguendo, that he made such an offer. The fact that the strip is not subject to an easement now indicates that there has been no acceptance. In any event, acceptance must be proved before a dedication is shown. Gilder v. City of Brenham, 67 Tex. 345, 3 S.W. 309.

The majority opinion emphasizes the fact that the Wells heirs asserted no claim to the strip until oil was discovered in the Hawkins field. In this connection the majority say: "Only the discovery of oil served as an incentive to exhume the lifeless corpse of an asserted reserved fee title to this narrow strip buried for over sixty years from the now asserting owners, their predecessors in title and the world at large." I attach no significance to the fact that the Wells heirs have not seen fit to make any use of the strip in controversy. They have owned the strip during the period of time in question and, while its value may have been such as to give them little or no incentive to use it, the fact remains that they have owned it and still own it in fee.

I do not understand that the owner of land may lose his title by abandonment. Sideck v. Duran, 67 Tex. 256, 3 S.W. 264; Allen v. West Lumber Co., Tex.Com.App., 244 S.W. 499.

It may be further observed in this connection that at the time the deed was executed in 1880 no one even dreamed that the land was oil land. It could more reasonably be presumed that grantor may have hoped that the town of Hawkins would some day become a city and extend its boundary to include the strip, in which event the strip would become valuable for business property. The strip contained about 1/10-acre and its value, measured by the $25 consideration recited in the deed to Stewart for the one-acre tract, would have been about $2.50. In consequence its reservation as a private and nearer way to school for the Wells and McCorkle children was not unreasonable. Such reservation is more in line with the facts than an assumption that the grantor intended to give it to the public, or to convey it to Stewart by the deed which excluded it from the conveyance.

Finally, I dissent from my colleagues' action in rendering the case instead of remanding it. If in fact the strip in question was not being used as a passageway in 1880 when Wells conveyed the one-acre tract to Stewart, there would be no basis whatsoever for the contention that the fee of the strip was conveyed to Stewart. In this connection appellees' witness Looney testified that in 1880 there was no passageway from the Hawkins and Big Sandy Road to the Winnsboro and Belzora Road along the northern boundary of the tier of one-acre lots in question. He further testified that the strip of land upon which appellees have an oil and gas lease was marshy land that could not then have been used as a passageway. He also testified that in 1880 the Winnsboro and Belzora Road lay to the west of where it is shown on the map made a part of the majority opinion. For these reasons, and in any event, the cause should be remanded to allow the trial court to determine whether or not the strip here involved was being used as a passageway in 1880 when Wells executed the deed to Stewart.